IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

|  |  |
|---|---|
| SEDRIC WARD,<br>    Plaintiff,<br><br>v.<br><br>SHELBY COUNTY,<br>    Defendant. | Case No. 2:20-cv-02407-JPM-cgc |

**ORDER GRANTING PLAINTIFF'S MOTION FOR A SEPARATE TRIAL**

Before the Court is Plaintiff Sedric Ward's ("Plaintiff" or "Ward") Motion for a Separate Trial, filed June 5, 2024. (ECF No. 213.) Ward asks the Court for a single-issue trial under Fed. R. Civ. P. 42(b) on the affirmative defense of waiver, or alternatively to sever this issue for its own trial under Fed. R. Civ. P. 21. (Id. at PageID 3372.) For the reasons set forth below, the motion for a single-issue trial is **GRANTED**.

**I.     BACKGROUND**

**A) Factual Background**

Plaintiff Sedric Ward brought this action against his former employer, Defendant Shelby County ("Defendant" or "County"), alleging violations of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4311 *et seq.* (Complaint, ECF No. 1.)

This Court's Summary Judgment Order lays out the asserted facts, both disputed and undisputed, that were later presented in each Party's case at trial:

> Plaintiff was employed by Shelby County at the Shelby County Jail (the "Jail"). (ECF No. 80-1 ¶ 1.) Plaintiff began working for the Shelby County Jail in 1998 and also served in the U.S. Army Reserve while employed by Shelby County. (ECF No. 72-2 ¶¶ 8–10.) In 2013, then-Shelby County Sheriff Bill Oldham ordered the

Bureau of Internal Audit to perform an audit of the Shelby County Sheriff's Office ("SCSO") Jail Division — Jail Human Resources Unit due to performance issues within the Jail's Human Resources Office ("January 2014 Audit Report"). (ECF No. 80-1 ¶ 2.) The January 2014 Audit Report found instances of alleged misuse of sick leave, Family and Medical Leave Act ("FMLA") leave, and paid military leave, as well as instances of inconsistent discipline. (Id. ¶ 4.) In January 2014, the SCSO's General Investigations Bureau ("GIB") had a detective, Jason Valentine ("Valentine"), review the audit report to determine if a criminal investigation into military leave was warranted. (Id. ¶ 5.) As of January 2014, Valentine was employed by Shelby County as a Sergeant with the GIB. (Id. ¶ 7.) Based on the January 2014 Audit Report, Valentine pursued a criminal investigation. (Id. ¶ 8.) Plaintiff was not listed in the January 2014 Audit Report as an individual who allegedly improperly took paid military leave. (ECF No. 80-1 ¶ 9.) Valentine consulted with the Shelby County District Attorney General's Office and determined the criminal investigation should focus only on receipt of military pay between January 10, 2010 through December 31, 2013. (Id. ¶ 12.) The January 2014 Audit Report was insufficient to support charges for any specific crime against any specific individual. (Id. ¶ 14.) Valentine then began his own investigation to determine if any specific individual had a committed a crime with respect to leave-time use, and began by running a payroll report of all Jail personnel during the relevant time period to determine who had received pay for military leave during that time. ("Valentine Investigation," Id. ¶¶ 15–16.) Valentine created a spreadsheet for each Jail employee who received paid military leave, and marked each employee with an "M" for paid military leave and "ZM" for unpaid military leave. (Id. ¶ 17.) Valentine reached out to the Defense Finance and Accounting Service ("DFAS") of the U.S. Department of Defense to gather documents to confirm each individual's service dates. (Id. ¶ 18.) Valentine compared payroll printouts for Jail service-member employees with their DFAS records. (Id. ¶ 19.) Valentine noted each time an individual had received some pay from Shelby County for time off for military duties, but did not have a corresponding DFAS record for the same day of duty. (Id. ¶ 20.) Valentine identified Plaintiff as an individual who had received over $1,000 in military leave pay for dates when there were no records that he had attended a military function. (Id. ¶ 21.) On May 23, 2014, Valentine interviewed Plaintiff as part of the criminal investigation, reviewed discrepancies in Plaintiff's Jail payroll and DFAS records with him, and showed him a copy of the spreadsheet where Plaintiff had allegedly received military leave pay. (ECF No. 80-1 ¶ 22.)

      The charge of felony theft of property of over $1,000 was submitted to the grand jury by Tennessee District Attorney Amy Weirich in September 2014. ("Criminal Investigation," ECF No. 64-4 at PageID 883.) On November 4, 2014,

the grand jury returned a true bill indicting Ward for felony theft of property valued at over $1,000. (ECF No. 80-1 ¶ 26.) The charges against Plaintiff were *nolle prosequi* on December 4, 2015. (Id. ¶ 28.)

On or about October 10, 2014, there was an administrative investigation into Plaintiff's alleged violation of SCSO employment policies ("Administrative Investigation") that was conducted by Eugenia Sumner ("Sumner"), a detective with the SCSO's Bureau of Professional Standards and Integrity ("BPSI"). (Id. ¶¶ 33–35.) The Administrative Investigation focused on Plaintiff's alleged violations of SCSO employment policies, including those relating to leave-time requests, personal conduct, and adherence to the law. (Id. ¶ 36.) On October 21, 2014, Sumner conducted an in-person interview with Plaintiff, at which he was told that he would have until noon of Friday, October 24, 2014, to provide documentation to show that he had not improperly taken military leave pay. (Id. ¶¶ 37–38.) Plaintiff did not appear at Sumner's office by October 24, 2014. (Id. ¶ 39.) Sumner compiled a report of facts and evidence that she collected during her administrative investigation, and found that Plaintiff had violated SCSO policies. (Id. ¶ 40.)

On January 27, 2015, the Chief Inspector for SCSO Jail Administration, Kirk Fields ("Fields"), conducted an Administrative Pre-Disciplinary Hearing with Plaintiff regarding the allegations of SCSO policy violations. (ECF No. 80-1 ¶¶ 45–47.) Following the hearing, Plaintiff was sent a Notice of Termination and dismissed from employment with the SCSO on April 7, 2015. (ECF No. 64-5.) On August 3, 2016, Plaintiff executed the "Agreement and General Release" (the "Release"). (ECF No. 80-1 ¶ 65.) According to the Release, Plaintiff was to return to work at the SCSO effective September 16, 2016, and Plaintiff was to be paid the equivalent of three weeks of back-pay wages. (ECF Nos. 1-1 at PageID 31–33; 80-1 ¶ 66 ) Plaintiff obtained documents regarding his USERRA rights prior to his termination. (ECF No. 80-1 ¶ 70.) The USERRA documents describe the protections afforded to servicemember employees, and Plaintiff was aware of his USERRA rights at the time he provided the USERRA documents to Shelby County. (Id. ¶¶ 71–72.) On September 7, 2016, Plaintiff declined to return to work with the SCSO, stating in an email that "it's been almost two years since I was relieved of duty from the Sheriff's office," and that "things wouldn't feel right if [he] returned." (Id. ¶ 73.)

(ECF No. 87 at PageID 1512–15.)

### B) Procedural Background

On February 19, 2021, Plaintiff moved for summary judgment and sought dismissal of Defendant's affirmative defense based on waiver. (ECF No. 60-1 at PageID 559.) Defendant

argued that Ward waived all claims arising out of his termination when he signed the Release in August 2016. (Id.) On March 9, 2021, Defendant moved for summary judgment based on the agreement in the Release to waive "any and all claims" against the SCSO. (ECF No. 64-1 at PageID 799.)

On June 25, 2021, the Court granted Plaintiff's motion on the issue of waiver. (ECF No. 87 at PageID 1519.) The Court held that because the Release made no mention of claims based on USERRA, the disclaimer of such claims was not "clear and unambiguous" as required in Wysocki v. Int'l Bus. Machine Corp. 607 F.3d 1102, 1108 (6th Cir. 2010); (ECF No. 87 at PageID 1520-1521.) The Court additionally held that the three weeks of backpay granted to Plaintiff under the Release was "nowhere close" to the seventeen months of lost back pay, pension credits, and benefits Plaintiff was entitled to under USERRA. (Id. at PageID 1522.) The Court therefore found that under 38 U.S.C. § 4302(b), any Release that "reduces, limits, or eliminates" Plaintiff's rights to recovery under USERRA was void. 38 U.S.C. § 4302(b); (ECF No. 87 at PageID 1521-1523.)

The case then proceeded to a jury trial on April 11–14, 2022. (ECF Nos. 148, 152, 153, 156.) On April 14, 2022, the jury returned a verdict in favor of Ward, finding that his USERRA rights were violated and that the violation by the County was willful. (ECF No. 157.) The jury further found that Plaintiff was entitled to $567,183 in lost wages and benefits, less $6,183 in unmitigated damages, for a total of $561,000, as well as an advisory verdict as to future damages in the amount of $150,000, or $50,000 per year for three years. (Id.)

The Court ruled on post-trial motions filed by both parties, upholding the lost wages award and liquidated damages award but reducing the front pay award to $49,635.59 total. (ECF No. 187.) On October 31, 2022, the Court adopted calculations of $238,850 in prejudgment interest

4

and $109,914 in tax offset, yielding a final judgment of $1,570,035.18.  (ECF Nos. 190, 191.)  On December 6, 2022, Defendant appealed the Court's judgment.  (ECF No. 202.)

On April 11, 2024, the Sixth Circuit issued an opinion addressing the Court's denial of summary judgment based on waiver.  (ECF No. 210 at PageID 3354-3355.)  It held that the relevant language from the Release stated that Ward had "agreed to release 'any and all claims whatsoever' as to his termination."  (Id. at PageID 3355.)  The Sixth Circuit reasoned that "to know that the [R]elease applied to Ward's USERRA claim, one needed to know only that it was a claim."  (Id.)  To instead require the parties to "enumerate, one by one, all the objects they intend a particular clause to reach" would "generate litigation rather than prevent it."  (Id.)  Instead, "[w]hen the parties intend to settle 'any and all claims'…the law allows them to say precisely that."  (Id.)

The Sixth Circuit then addressed whether the Release was effective to release a claim under USERRA, based on whether the rights Ward received under the Release were "'more beneficial'… than the ones he [gave] up."  (Id. at PageID 3356.)  It rejected the Court's finding that "three weeks of back-pay and a reinstatement with probation is objectively less beneficial than Plaintiff's rights under USERRA[.]"  (Id. at PageID 3357.)  The Sixth Circuit held that:

> § 4302 does not make the courts guardians of servicemembers who choose to settle their USERRA claims.  To the contrary, we said in Wysocki, servicemembers can "waive their USERRA rights without unnecessary court interference, if they believe that the consideration they will receive . . . is more beneficial than pursuing their rights through the courts[.]"  607 F.3d at 1108 (emphasis added).  An individual servicemember knows better than the courts do whether the certainty of a lump-sum payment up front, for example, is "more beneficial" to him than the possibility of a larger recovery later.  Relatedly, a servicemember's ability to settle a USERRA claim "is both valuable and beneficial[.]"  Id.  And that ability would be diminished if not eliminated if the servicemember's decision was subject to judicial review after the fact.

(ECF No. 210 at PageID 3357.)

As to Ward's argument that the Court's judgment in this action outweighed what he would have received under the Release, the Sixth Circuit responded that:

> whether an agreement is more beneficial to a servicemember than the released claim, for purposes of § 4302, cannot depend on events occurring after the agreement is executed. As a matter of contract law generally, the parties' respective rights and duties are fixed at the time of contracting.… And the decision whether to enter into a settlement agreement, in particular, always involves an assessment of potentialities. Nobody would settle a USERRA claim with a servicemember if he could proceed to litigate the claim and then invalidate the agreement if he fared better in the litigation than in the settlement itself.

(ECF No. 210 at PageID 3357.)

The Sixth Circuit added, however, that USERRA still required a servicemember to:

> make a considered judgment that the agreement is more beneficial to him than his USERRA claim is. Of course—absent "evidence of mistake, incapacity, fraud, misrepresentation, unconscionability, or duress[,]" Wysocki, 607 F.3d at 1108—that a servicemember chose to enter into a settlement agreement can be important evidence that he thought the agreement was worth more to him than the claim. But that determination must depend on the totality of the circumstances, not on the fact of the agreement alone. Here, those circumstances included that Ward was aware of his USERRA claim and represented by counsel when he entered into the settlement agreement. But Ward also testified that the agreement was presented to him on a "take it or leave it" basis, potentially akin to an adhesion contract; and he testified that he had been out of work for 18 months when he entered into it. On this record, a reasonable jury could find that Ward's decision to enter into the agreement reflected a considered decision on his part, or instead that it reflected only desperation. The issue whether Ward believed benefits from the settlement agreement outweighed his USERRA claim is therefore one for a jury to decide.

(ECF No. 210 at PageID 3358.)

The Court's judgment was therefore "vacated, and the case…remanded for proceedings consistent with this opinion." (Id.)

## II.    LEGAL STANDARD

### A) Separate Trials or Severance of a Claim

6

Fed. R. Civ. P. 42(b) authorizes a court to order separate trials on one or more separate issues "[f]or convenience, to avoid prejudice, or to expedite and economize[.]" Alternatively, Fed. R. Civ. P. 21 authorizes a court to sever any claim against a party.

**B) Scope of a Remand**

Upon vacating a district court's judgment, an appellate court's remand to the district court may be either general or limited. United States v. Henry, 983 F.3d 214, 226 (6th Cir. 2020). General remand "allows the district court to…[review] de novo, which means that the district court may redo the entire…process including considering new evidence and issues.…Conversely, a limited remand constrains the district court's…authority to the issue or issues remanded." United States v. Moore, 131 F.3d 595, 597-8 (6th Cir. 1997) (citations omitted); see also United States v. Campbell, 168 F.3d 263, 265 (6th Cir. 1999) ("Limited remands explicitly outline the issues to be addressed by the district court and create a narrow framework within which the district court must operate.… General remands, in contrast, give district courts authority to address all matters as long as remaining consistent with the remand.")

Courts operate under the rebuttable presumption that a remand is general. United States v. Woodside, 895 F.3d 894, 899 (6th Cir. 2018). "A limited remand must convey clearly the intent to limit the scope of the district court's review." Campbell, 168 F.3d at 267. "Although the particular intricacies of each case will influence" how to determine whether remand should be construed as limited, the Sixth Circuit "has established relevant principles." Id. at 266.

The first question is what part of the Sixth Circuit's mandate was "intended to define the scope of any subsequent proceedings." Id. This language could appear anywhere in the mandate, but "individual paragraphs and sentences must not be read out of context." Id. at 267. The scope of remand must reflect "the spirit of the mandate, taking into account the appellate court's opinion

7

and the circumstances it embraces." United States v. O'Dell, 320 F.3d 674, 680-81 (6th Cir. 2003) (citing United States v. Moored, 38 F.3d 1419, 1421 (6th Cir. 1994)). In other words, the language of the remand itself "'must be read with the analysis offered in the opinion.'" O'Dell, 320 F.3d at 681 (citing United States v. Santonelli, 128 F.3d at 1237-38 (8th Cir. 1997)).

### III.   ANALYSIS

The Sixth Circuit focused on whether the Court was correct in dismissing the affirmative defense of waiver. (ECF No. 210 at PageID 3355-7.) It found that while the Court's reasoning for doing so was wrong, waiver still may not apply if Ward signed the Release without a considered decision as to whether "the agreement is more beneficial to him than his USERRA claim is." (Id. at PageID 3358.) The Sixth Circuit further held that "whether Ward believed benefits from the settlement agreement outweighed his USERRA claim is… for a jury to decide." (Id.)

Ward argues that Fed. R. Civ. P. 42(b) authorizes the Court to hold separate trials on different issues in the same action "[f]or convenience, to avoid prejudice, or to expedite or economize…" (ECF No. 213 at PageID 3376). Unlike in most actions brought under Fed. R. Civ. P. 42(b), Ward does not argue that the Court needs to have two different trials in this action. Ward instead argues that the Court need only re-try the waiver issue because the Sixth Circuit issued a limited remand as to that affirmative defense. (Id. at PageID 3374-3376.)

The Sixth Circuit, in Moore, identified examples of remands where:

on a subsequent appeal, the court construed its remand order as general rather than specific because the order contained no limiting language. It simply directed the district court to resentence the defendant. For example, in [United States v.] Young, the defendant … challenged his sentence contending that the district court exceeded the scope of the remand. In rejecting the defendant's challenge, the appellate court reiterated its remand order which stated that "we therefore vacate the district court's sentence and remand the case for resentencing consistent with this opinion."… [Young, 66 F.3d 830, 836 (7th Cir. 1995)]. After restating its remand order, the appellate court declared that "our order in no way constrained the scope of the issues the district court could consider on resentencing…." Id.

8

Moore, 131 F.3d at 598 (citations amended).

In contrast, Moore also identified cases like Santonelli where "the appellate court issued a limited remand and required adherence to that limited remand in a subsequent appeal." Moore, 131 F.3d at 598. In Santonelli, the Eighth Circuit's order "vacate[d] [Santonelli's] sentence and remand[ed] his case to the district court for resentencing." 128 F.3d at 1236. In the preceding phrase, the Eighth Circuit specified that vacature and remand were appropriate "[b]ecause the sentence may have been affected by [] incorrect information[.]" Id. at 1236-7. As the Sixth Circuit explained in O'Dell:

> [s]ignificantly, according to the Eighth Circuit, [this mandate] was a limited mandate despite its general phrasing because the language "must be read with the analysis offered in the opinion." [] Santonelli, 128 F.3d at 1237-38 []. Thus, context matters.

O'Dell, 320 F.3d at 681 (citations amended).

Applying this framework in O'Dell, the Sixth Circuit held its remand therein was limited. See Id. at 680-1. The remand's limiting language instructed the district court to "resentence without application of the safety valve." Id. at 681. The Sixth Circuit also considered the context of this remand:

> A key circumstantial factor indicates that O'Dell IV contained a limited mandate. The government not only argued that the court should have imposed a five-year sentence, it also argued alternatively that a sentence below twenty-four months was error. Yet we found it unnecessary to address the latter contention.… If we intended a general remand and a *de novo* sentencing, it would have made sense to address the government's alternative argument.

Id. (citations omitted).

Ward argues that in this case, the Sixth Circuit did not suggest that the Court should re-try the jury's findings as to liability, damages, and willfulness. (ECF No. 213 at PageID 3373-4.) Instead, the Sixth Circuit stated that a jury must decide "whether Ward believed benefits from the

9

settlement agreement outweighed his USERRA claim[.]" (Id.; ECF No. 210 at 3358.) Citing O'Dell, Ward argues that a remand directing a specific, narrow course of action, as here, is limited. 320 F.3d at 680-81 (ECF No. 213 at PageID 3374.) Anything other than a discrete trial on the issue of waiver would therefore be inconsistent with the Court's authority. (Id. at PageID 3375.)

The County responds that the examples of general and limited remand in Moore and O'Dell demonstrate that the Sixth Circuit will clearly state when it is vacating only part of a judgment and limiting the scope of any new proceedings. 131 F.3d at 598-9; (ECF No. 215 at PageID 3387.) This is consistent with the general rule that in "the absence of an explicit limitation, the remand order is presumptively a general one." Moore, 131 F.3d at 598; (ECF No. 215 at PageID 3387.) The County argues that the remand here did not provide any indicia that it was limited to a single issue. (ECF No. 210 at PageID 3358; ECF No. 215 at PageID 3388.)

The County also asserts that the absence of any Sixth Circuit ruling on other issues does not itself limit the scope of remand. (ECF No. 215 at PageID 3388.) It reasons that because vacating the judgment moots any other issues with it, the Sixth Circuit simply chose not to address the issues it had just mooted. (Id.) The County argues that because the remand was a general one, vacating the judgement still "swept away all that was tied to the judgment." (Id. at PageID 3386 (citing Falcon v. General Tel. Co., 815 F.2d 317, 320 (5th Cir. 1987)).) The County therefore concludes that a trial *de novo* on all issues is required. (ECF No. 215 at PageID 3388.)

The language of the remand itself is not limiting, as it only requires that future proceedings are "consistent with this opinion." (ECF No. 210 at PageID 3358.) This language, however, must be read in the context of the rest of the Sixth Circuit's decision. See Santonelli, 128 F.3d at 1237. The Sixth Circuit only discussed the defense of waiver in the current case, and it only identified one issue of fact related to this defense for a jury to decide. (ECF No. 210 at PageID 3355-8.) The

10

question is therefore whether the absence of any other discussion provides "context" that limits the remand to this defense.

In this regard, O'Dell refutes the County's assertion that the Sixth Circuit's silence on other issues is consistent with a general remand. 320 F.3d at 681; (ECF No. 215 at PageID 3388.) The Sixth Circuit held that if it intended to issue a "general remand" in that case, it would have addressed alternative arguments that it instead deemed unnecessary to discuss. O'Dell, 320 F.3d at 681. If the Sixth Circuit intended to issue a general remand in this case, it presumably would have discussed any arguments the parties raised as to liability, damages, and willfulness. Assuming *arguendo* the Sixth Circuit would issue a general remand without discussing every issue, the question becomes why it here chose to work backwards, start with an affirmative defense, and not address the underlying cause of action afterwards. No authority suggests that it would.

The Sixth Circuit's analysis demonstrates that it intended to limit remand to only the affirmative defense of waiver, particularly whether such waiver was based on careful consideration of its merits. To the extent that a "separate trial" under Fed. R. Civ. P. 42(b) would limit the scope thereof to this one defense, Ward's request for a separate trial is **GRANTED**.

IV.     **CONCLUSION**

For the foregoing reasons, Plaintiff's Motion is **GRANTED**. The jury trial will only address whether the affirmative defense of waiver precludes recovery on Ward's USERRA claims.

**SO ORDERED**, this 1st day of July, 2024.

 /s/ Jon P. McCalla
JON P. MCCALLA
UNITED STATES DISTRICT COURT JUDGE